UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RUBEN M.,                                             :
                    Plaintiff,                        :
                                                      :
          v.                                          :          C.A. No. 19-119MSM
                                                      :
ANDREW M. SAUL,                                       :
COMMISSIONER OF SOCIAL SECURITY,                      :
                    Defendant.                        :

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Before the Court is the motion of Plaintiff Ruben M. for reversal of the decision of the

Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the

Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act").  Plaintiff contends that the

administrative law judge ("ALJ") relied on a residual functional capacity ("RFC")[1] assessment

that is not supported by the totality of the evidence of record.  Defendant Andrew M. Saul

("Defendant") has filed a counter motion for an order affirming the Commissioner's decision.

The matter has been referred to me for preliminary review, findings and recommended

disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entirety of the relevant

portion of the record,[2] I find that the ALJ erred in setting nonexertional RFC limits both by

ignoring the state-agency psychologist's opinion that he is not capable of more than simple tasks

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

[2] In determining relevancy, the Court was guided by Plaintiff's brief, in which he lists the pages from the medical record that he considers to be not relevant.  ECF No. 12-1 at 6 n.4.  In deciding what portions of the record to review and consider, the Court assumed that one of the page numbers provided by Plaintiff was a typographical error ("400" instead of "490") and ignored the suggestion to disregard pages 400 to 489.  Those pages were read and considered.

or of interacting appropriately with the general public, as well as by discounting portions of the opinion submitted by a treating mental health clinical nurse specialist based on the ALJ's erroneous conclusions that it is inconsistent with the other evidence and that virtually all mental status evaluations of record are "within normal limits." I also find that the ALJ erred in basing his exertional RFC on the opinion of a state-agency expert physician whose file review was completed well before Plaintiff's February 2018 MRI resulted in the discovery of potentially material and previously unknown lumbar spinal findings, resulting in a more aggressive approach to treatment of Plaintiff's back pain. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be DENIED.

## I.    <u>Background</u>

The record reflects that Plaintiff has been enmeshed in a "chaotic lifestyle," Tr. 681, first in Puerto Rico (until 1995) and then in Rhode Island. <u>Id.</u> During childhood, he was almost raped and played with matches causing a house to burn down; twenty-five years ago, as a young man in Puerto Rico, he was shot in the right wrist and left knee. One of his two friends shot at the same time was killed. With a ninth-grade education, he has worked intermittently, mostly through placement agencies, doing such jobs as machine operator, and furniture mover, often part-time and never for very long; at least once, he was fired from a job because of problems getting along with others. Tr. 438. He has four children by four different women but has never married. A daughter was raped by his brother, who was imprisoned for it and released during the relevant period. In 2000, Plaintiff was convicted of armed robbery and served over three years in jail; he remained on state probation until 2017. More recently, he was jailed on a charge but was

"bailed out and . . . won the case." Tr. 57. Until April 2016, he received no mental health treatment. Plaintiff is bilingual in Spanish and English, but reads only in Spanish.

On January 6, 2015, when he was 44 years old (a "younger" person in Social Security parlance), Plaintiff was shot in the left thigh. The wound was complicated by an infection and shrapnel related to the gunshot remains embedded in his tissue. Based on this injury, without the aid of an attorney, Plaintiff applied twice for disability (both DIB and SSI), on February 5, 2015, and May 24, 2016; both sets of applications were denied at the initial administrative phase (on June 13, 2015, and August 20, 2016, respectively) and Plaintiff did not pursue them further. In connection with the second of these two applications, Plaintiff relied not only on the gunshot wound, but also on various mental health disorders (post-traumatic stress disorder ("PTSD"), anxiety and depression). In denying the second of these, the Commissioner's initial assessment concluded that Plaintiff's recovery from the gunshot was continuing, that his claim that he needed to use a cane was undermined by the lack of any "evidence that use of cane is medically necessary," Tr. 119, 130, and, with nothing beyond an initial assessment and no ongoing mental health treatment, that he was only moderately limited in his ability to accept instructions or to deal with the public. Tr. 115-25, 126-36.

Plaintiff's third set of applications are the ones now in issue. They were filed in January and February 2017, again without an attorney. After they were denied initially, Plaintiff engaged legal counsel; advised by counsel, he amended his alleged onset date from shortly after he was shot in January 2015 to April 15, 2016, when he initiated mental health treatment at the Providence Center.

During the period in issue (beginning on April 15, 2016),[3] Plaintiff has had no employment and has been living with his mother and, at times, with a nephew whose involvement with street violence (the nephew was shot during the relevant period) triggered Plaintiff's PTSD and with a niece who was in jail at the time of the ALJ hearing. Tr. 53, 70, 73. He has friends and, for the past nine years, has had a "long-term partner." Tr. 53. He attends church with his mother. Tr. 362, 414, 446.

*Physical Symptoms and Treatment*. At the start of the relevant period (in April-May 2016), treatment of Plaintiff's ongoing pain in his back and left leg (from the gunshot) was still conducted by Nardone Medical, whose providers noted pain and Plaintiff's unprescribed use of a cane; they suggested that he should see an orthopedist. In June 2016, he was referred to an orthopedic surgeon, Dr. Howard Hirsch, who performed an examination, finding a mild limp, mild atrophy, diffuse allodynia[4] and moderate limits on motion due to "pain behavior."[5] Tr. 749-50. In July 2016, he saw a podiatrist and got a foot injection for an unrelated foot condition. Tr. 746. The next record reflecting treatment of leg and back pain is not until March 2017, when he initiated care with Dr. Tariq Malik, an internist at Providence Community Heath Center. Tr. 739. Dr. Malik noted his limp and complaints about his back, concluded that the back pain appeared to be caused by his "altered posture and mobility secondary to left knee dysfunction," and sent him to physical therapy (including aquatic therapy). Tr. 757. Based on this skimpy

---

[3] For purposes of Plaintiff's DIB claim, the period in issue ends with his date last insured, June 30, 2017.

[4] Plaintiff's brief explains that allodynia refers to central pain sensitization (increased response of neurons) following normally non-painful, often repetitive, stimulation. Allodynia can lead to the triggering of a pain response from stimuli which do not normally provoke pain. ECF No. 12-1 at 10 n.8 (citing https://en.wikipedia.org).

[5] The state-agency file-reviewing physicians characterized these examination results as "unremarkable knee exam and pain behavior." Tr. 171.

record, the state-agency file-reviewing physician expert (Dr. Donn Quinn)[6] concluded that Plaintiff was somewhat exertionally limited, but that he could lift up to fifty pounds occasionally and twenty-five pounds frequently, and could sit, stand or walk for up to six hours each in a normal workday. Tr. 170.

After file review was completed by Dr. Quinn on June 28, 2017, Plaintiff continued treatment with Dr. Malik, who continued to observe pain with weight bearing, walking with a limp, and spine and knee abnormalities on examination. Then in January 2018, Plaintiff was seen by another orthopedic surgeon, Dr. Steven Blazar of Orthopedics RI. Tr. 863. A physician assistant at Orthopedics RI noted Plaintiff's use of a knee brace and recommended that he continue to use the brace. Tr. 861. At about the same time, on February 23, 2018, an MRI of Plaintiff's spine was ordered; it established for the first time that Plaintiff had a moderate disc bulge with moderately severe foraminal narrowing, which the radiologist recommended be clinically correlated with L4 radiculopathy.[7] Tr. 1047. In addition to yet another physical therapy referral, Plaintiff was promptly sent to Dr. Maher El-Khatib. Tr. 1022-24. Dr. El-Khatib recommended the immediate initiation of a course of injections, Tr. 1019-20, and performed the first lumbar injection on April 19, 2018, with the expectation that there would be further lumbar injections, and possibly facet injections. Tr. 1045. During examinations by various providers in 2018, Plaintiff was observed to have an impaired gait, positive straight-leg-raise on the left,

---

[6] Dr. Henry Laurelli is the state-agency physician who reviewed the file initially; his opinion is adopted by Dr. Quinn at the reconsideration phase. The ALJ's decision and the parties' briefs refer only to Dr. Quinn. I adopt the same protocol.

[7] According to the Orthopedic RI's records, this MRI was ordered "at RIH Spine by Dr. Kim," and performed in February 2018 without the knowledge of Dr. Blazar, who also planned to order an MRI. Tr. 1024. When the confusion was cleared up, Orthopedics RI physicians procured and relied on the already completed MRI. What is pertinent to the Court's consideration of the issues is that Plaintiff's spinal MRI was performed on February 23, 2018, has abnormal findings and is in the medical record. Tr. 1047.

tenderness, great difficulty walking and the inability to walk upstairs. Tr. 1018-42. None of this evidence regarding Plaintiff's spine was seen by Dr. Quinn.

*Mental Health Symptoms and Treatment*. Despite the near dearth of mention of mental health symptoms or treatment in the two prior applications, mental health concerns are the focus of the treatment reflected in the record of the pending application. This portion of the record begins with Plaintiff's intake as a new patient at the Providence Center in April 2016, with a seriously abnormal mental status examination ("MSE") reflecting racing thoughts, thoughts of inadequacy and worthlessness, flashbacks, anxiety, sadness and depression. His care team was quickly staffed up with a counselor with a master's in social work (Clara Ramirez), a case manager (Carlos Guzman and later Priscilla Villa), and a mental health clinical nurse specialist, Nurse Marol Kerge. Nurse Kerge's June 2016 psychiatric evaluation is similar to the intake assessment; it reflects suspiciousness, voices that are like intrusive thoughts, depressed mood, irritability, poor sleep, flashbacks, nightmares, and limited affect range. Tr. 684. Counsellor Ramirez's April 2016 MSE likewise recorded observations of no eye contact, disheveled appearance, agitation, anxiety, rapid speech, disorganized thoughts, and delusions. Tr. 688. During the second half of 2016, Plaintiff continued to see all three mental health professionals; his MSEs improved, but abnormal findings continued. E.g., Tr. 721 (Ramirez Dec. 2016 MSE: depressed, anxious mood, delusional thought content, fearful, hallucinations, hears non-command voices); Tr. 826 (Kerge Oct. 2016 MSE: depressed, anxious mood), Tr. 849 (Guzman Sept. 2016 MSE: guarded behavior, depressed, anxious mood).

In January 2017, Plaintiff's depression took a turn for the worse, ultimately resulting in a week-long admission to Butler Hospital in February 2017; the Butler intake MSE was severely abnormal, but by discharge, it had significantly improved. Tr. 700-02, 814-19. After the

hospitalization, from March to June 2017, Nurse Kerge, Counsellor Ramirez and the new case manager, Ms. Villa, continued to make abnormal MSE observations. E.g., Tr. 783 (Kerge May 2017 MSE: constricted affect, depressed, anxious mood, delusional, suspicious thought content); Tr. 787 (Ramirez May 2017 MSE: depressed, anxious mood, tangential speech, disorganized thought process, sleep disturbance due to nightmares, decrease in appetite, decrease in energy level); Tr. 855 (Villa Apr. 2017 MSE: disheveled appearance, constricted affect, anxious mood, sleep disturbance). In most of these reports, the providers also noted Plaintiff's limp and impaired, slow gait. E.g., id. ("limping has gotten worse").

The mental health state-agency file reviewer (a psychologist, Dr. Albert Hamel)[8] examined the Providence Center's record in early July 2017. He acknowledged that Plaintiff's PTSD and depression were severe for Step Two purposes; he opined that Plaintiff retained the ability to do only simple tasks without interaction with the general public. In reaching these findings, Dr. Hamel noted Plaintiff's ongoing use of marijuana, the dearth of mental health treatment on the two prior applications and that Plaintiff appeared to be improving (though not yet back to baseline) after his week-long inpatient stay at Butler Hospital.

After the state-agency file review was completed, Plaintiff continued treating with the Providence Center team. The most material change during this post-file review period is Plaintiff's sobriety; in June 2017, he was no longer positive for marijuana or any other substances and appears to have sustained sobriety for the remainder of the period in issue. Tr. 996, 1044. Nevertheless, during this period, Plaintiff's mental health abnormalities persisted. Although his symptoms sometimes receded, e.g., Tr. 937 (Ramirez Oct. 2017 MSE almost

---

[8] The file was reviewed initially by another psychologist, Dr. John Warren. His opinion is adopted by Dr. Hamel at the reconsideration phase. The ALJ's decision and the parties' brief refer only to Dr. Hamel. I adopt the same protocol.

normal), they also sometimes got worse, e.g., Tr. 939 (Ramirez Nov. 2017 MSE: depressed affect, poor eye contact, decreased energy, sad, depressed, anxious, worried mood, sleep disturbance, speech tangential). The case manager, Ms. Villa, recorded similar ebbs and flows. E.g., Tr. 954 (Villa Oct. 2017 MSE: normal except guarded behavior); Tr. 956 (Villa Nov. 2017 MSE: poor eye contact, apathetic, sad, depressed mood, abnormal motor movements, speech circumstantial, racing, ruminations, circumstantial thought); Tr. 967 (Villa Feb. 2018 MSE: affect anxious, but otherwise normal). In August 2017, Nurse Kerge made very troubling MSE findings: constricted affect, depressed irritable mood, delusional, suspicious thought content, sleep disturbance, Tr. 977, while in December 2017 and again in February 2018, Nurse Kerge's MSEs are essentially normal. Tr. 983-87. However, in approximately the same period, Counselor Ramirez noted significant abnormalities. E.g., Tr. 942 (Ramirez Dec. 2017 MSE: depressed affect, decreased energy, sad, depressed mood, visual hallucinations, sleep disturbance, speech, thought content tangential); Tr. 947 (Ramirez Feb. 2018 MSE: depressed affect, poor eye contact, sad, depressed mood).

*Opinion Evidence.* After the last treatment of record and shortly before the ALJ hearing, on April 13, 2018, Nurse Kerge submitted a detailed RFC opinion, opining that, since April 2016, Plaintiff has been moderately severely limited in his ability to relate to other people (including co-workers), in his daily activities and in his personal habits and that his impairments would cause workday interruptions and absences. Tr. 1015. Otherwise, the Kerge opinion reflects moderate limitations. Apart from those prepared by the state-agency file-reviewing expert physicians and psychologists, this is the only medical opinion of record that lists specific RFC limitations.

## II. <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42

U.S.C. § 405(g).  <u>Allen v. Colvin</u>, No. CA 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing <u>Jackson v. Chater</u>, 99 F.3d 1086, 1097-98 (11th Cir.1996)).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001).

### III.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    **The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

On a DIB claim, the claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79 (1st Cir. 1982); 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**B.      Opinions from Treating Providers**

Because his applications were filed prior to March 27, 2017, Plaintiff's case is subject to the treating physician/opinion evidence rules that were in place prior to the recent amendment. 20 C.F.R. § 404.1527.[9]  Pursuant to this obsolete standard, substantial weight should be given to the opinions, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the

---

[9] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, the Court hereafter will primarily cite to one set of regulations only.  See id.

treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). As SSR 96-2p provides:

> The notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188 (July 2, 1996).

Under the now-obsolete rule, a treating source who is not a licensed physician or psychologist is considered not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *45595 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight or to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *45594. However, an "other source," such as a nurse or licensed clinical social worker, may provide important insight into the severity of an impairment, including its impact on the individual's ability to function. Id. The SSA recognizes the reality that non-acceptable medical sources, such as nurses, are increasingly performing functions that were previously in the exclusive domain of physicians and psychologists. See id. at *45595. The opinions of non-acceptable medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects." Id.

In evaluating a non-acceptable medical source opinion, the ALJ is instructed to consider the same factors that guide consideration of the opinion from a treating physician or psychologist. See 20 C.F.R. §§ 404.1527(c), (f). These include the nature of the relationship

between the medical source and the claimant, the supportability of the opinion, the consistency

of the opinion with the record as a whole, and whether the source of the opinion is a specialist;

the ALJ generally should explain the weight given to non-acceptable medical source opinions or

otherwise ensure that his discussion of the evidence makes his reasoning apparent.  The ALJ may

assign greater weight to an opinion from a non-acceptable medical source than from an

acceptable medical source.  See SSR 06-03p, 2006 WL 2263437, at *45596; Korfiatis v.

Berryhill, Case No. 18-cv-210-PB, 2019 WL 1110798, at *4 (D.N.H. Mar. 8, 2019).

## IV.   Analysis

Plaintiff argues that the ALJ formed an impermissible lay opinion as to his RFC and then

improperly cobbled together fragments of medical evidence and opinions to justify the

conclusion.  In support of the argument, Plaintiff points out that the ALJ's decision is riddled

with factual misstatements, which he contends reflect material errors that taint the decision and

require remand, particularly where Plaintiff's age (once he turned 45 in September 2017)[10] and

other characteristics would compel a Grid-based determination of disability if he were found to

be limited to sedentary work.  Tr. 84.  While Plaintiff's arguments are undeveloped, requiring the

Court to reach beyond them to achieve "a just outcome," Pelletier v. Sec'y of Health, Educ. &

Welfare, 525 F.2d 158, 161 (1st Cir. 1975), I nevertheless find that the ALJ's decision suffers

from material errors and recommend that the matter be remanded for further proceedings.

*Nonexertional RFC.*  Plaintiff's mental-health-based nonexertional limitations as

reflected in Nurse Kerge's RFC opinion are the primary thrust of these applications and the

principal focus of this appeal from the ALJ's rejection of them.  He argues the ALJ erred in

setting RFC limits by relying heavily on the plainly inaccurate finding (repeated seven times in

---

[10] As the ALJ correctly noted at the hearing, this argument applies only to the SSI claim; Plaintiff's date last insured
was prior to his 45th birthday.  Tr. 85.

the decision) that virtually all mental status evaluations of record were "within normal limits."[11] Tr. 27-30.  He also contends that the ALJ cherry-picked Nurse Kerge's treating opinion, adopting the limitations that aligned with his pre-formed RFC and rejecting those that did not. Plaintiff critiques the ALJ's affirmative reliance on the lack of an opinion from a psychologist or physician in a case where the record is clear that Nurse Kerge is the lead treating provider on the Providence Center's treating team.[12]  And he challenges the ALJ's conclusion that Nurse Kerge's RFC opinion clashes with her own treating notes and with the other mental health treating records prepared by her colleagues on the Providence Center treating team.

All of these arguments are well founded.  Although, as one from a non-acceptable medical source, Nurse Kerge's opinion cannot be afforded controlling weight or be relied on for the establishment of an impairment, the relevant SSR requires that such an opinion is "important and should be evaluated on key issues such as impairment severity and functional effects."  SSR 06-03p, 2006 WL 2263437, at *45595.  In assessing it, the ALJ was required to consider the same factors that guide consideration of the opinion of a psychologist or physician and to explain the weight given with sufficient discussion to make the reasoning apparent.  20 C.F.R. § 404.1527(c) & (f); see Korfiatis, 2019 WL 1110798, at *4.

---

[11] The Court's review of the record confirmed that Plaintiff is right – the MSEs of record are replete with abnormal findings; while there are a few within normal limits, they are the exceptions.  Therefore, the ALJ's flat statement that the MSEs of record are "within normal limits" is simply wrong.  Sometimes, however, the ALJ's decision makes this finding on a more limited basis, with respect to a specified block of time.  E.g., Tr. 28 ("for the period September 2017 through February 2018 . . . mental status examination were within normal limits and without significant abnormalities").  To see whether analysis of the MSEs through the lens of these time frames might yield a different result, the Court also focused on the ones in the identified periods of time.  The decision fared no better under this method of scrutiny.

[12] Ironically, this distinction would have been irrelevant if Plaintiff's SSI application had been filed a month later – under the new regulations, the "acceptable medical source" concept has been abandoned in favor of "persuasiveness."  20 C.F.R. § 404.1520c.

Here, the ALJ rejected Nurse Kerge's opinion that Plaintiff is moderately severely impaired in relating to other people, including co-workers, and has mental impairments that would cause workday interruptions and absences (more than three a month) in reliance on the supposed inconsistency of these limits with the "evidence of record or by her progress notes" and because "[t]he claimant's mental status examinations have been within normal limits." Tr. 30. Both of these findings are unsupported by the evidence. First, consistent with Nurse Kerge's opinion, her treating notes repeatedly refer to irritability, constricted or limited affect, suspiciousness, hearing voices, and depression, sadness and anxiety. E.g., Tr. 684, 783, 828, 975. The balance of the treating record, including the notes from all other members of the Providence Center team and from the intake team at Butler, are consistent with these observations. E.g., Tr. 688 (disheveled, agitated, anxious, rapid speech, disorganized thoughts); Tr. 701, 819 (no eye contact, sad, depressed); 855 (disheveled, constricted affect). Other evidence – including Plaintiff's extremely spotty employment history, his criminal involvement, his multiple gunshot wounds, his report of being fired at least once because of an argument, and the Social Security field office observation of Plaintiff's agitation and anger during the application process – all corroborates the Kerge medical findings. As to the MSEs, while Nurse Kerge did make relatively normal findings at Plaintiff's last two appointments, those are outliers. Otherwise virtually all of the MSEs performed by Nurse Kerge, the other members of the Providence Center team and the providers at Butler Hospital have abnormal observations. The ALJ's foundational seven-times-repeated mantra that "mental status evaluations were within normal limits" is simply wrong. With these serious errors tainting both of the ALJ's reasons for discounting Nurse Kerge's opinion, the ALJ's treatment of it lacks the support of substantial evidence. This error is material, requiring remand.

While Plaintiff has not challenged the ALJ's treatment of the state-agency psychologists' opinions, the Court is troubled by his apparent disregard of certain of their conclusions.[13] For example, consistent with Nurse Kerge's opinion that Plaintiff's ability to relate to other people (including co-workers) is moderately severely impaired, Dr. Hamel opined that Plaintiff lacked the ability "to interact appropriately with the general public." Tr. 172. Yet the ALJ ignored this important limitation – his RFC includes the ability to "have superficial contact with co-employees and with the general public." Tr. 24. The Commissioner concedes this error but argues that it is harmless in that "unskilled jobs . . . ordinarily involve dealing primarily with objects." See SSR 85-15, 1985 WL 56857, at *4. The Court declines to adopt such a categorical approach; here, the testimony of the vocational expert ("VE") regarding available work was based on a hypothetical that included the affirmative ability to have at least superficial contact with co-workers and the public. Tr. 87. With every medical opinion finding Plaintiff to be more limited, it was error for the ALJ to rely on the VE's input. I recommend that this issue be included in the Court's remand order.[14] See Pelletier v. Colvin, C.A. No. 13-651 ML, 2015 WL 247711, at *17 (D.R.I. Jan. 20, 2015) ("in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to

---

[13] While the Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion, Rodriguez Pagan, 819 F.2d at 3, the Court may, and should, raise issues *sua sponte* when the review of the record suggests that justice requires it. Silva v. Colvin, No. CA 14-301 S, 2015 WL 5023096, at *13 (D.R.I. Aug. 24, 2015); see Wilting v. Astrue, Civil No. 09-cv-01207-WYD, 2010 WL 3023387, at *7 (D. Colo. July 29, 2010) (when court's duty to scrutinize the record uncovers errors, court should raise them *sua sponte*); Choquette v. Astrue, No. C.A. 08–384A, 2009 WL 2843334, at *10 n.2 (D.R.I. Aug. 31, 2009) (when court encounters error plaintiff did not raise, it is compelled to raise it *sua sponte*).

[14] Relatedly, the Commissioner also concedes that it was error for the ALJ to exclude from the RFC a limitation based on the state-agency psychologists' opinion that Plaintiff is not capable of more than simple tasks. The ALJ seemed to consider adding this limitation to the hypothetical posed to the VE but stopped himself. See Tr. 87 ("This person could do simple – do I say that?"). This limitation is entirely omitted from the RFC. Tr. 24. The Commissioner argues that this error is harmless because the VE's testimony reflects only unskilled work. On this point, the Commissioner is right. But with remand required to address the other errors, I also recommend that this one should be addressed.

conclusions that are supported by the outputs from the medical authorities") (quoting Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)).

To recap, I recommend that the Court remand this case for further consideration of Plaintiff's nonexertional RFC in light of the MSEs of record, for further evaluation of the weight to be afforded to Nurse Kerge's opinion and for proper consideration of the opinions of the state-agency psychologists.

*Exertional RFC.* Plaintiff argues that the ALJ failed properly to evaluate the totality of his exertional RFC limitations caused by the gunshot wounds, resulting in leg, thigh and back pain.[15] The argument seems to amount to a request that the Court engage in the forbidden exercise of reweighing the evidence. As the Commissioner correctly points out, Plaintiff does not attack the ALJ's reliance on the state-agency physician expert (Dr. Quinn), nor has he presented any opinion supporting greater limiting effects (than those in Dr. Quinn's opinion) of his physical symptoms. Rather, he points to the many record references to antalgic gait, to the "objective evidence of the Plaintiff's lower extremity knee and thigh pain," ECF No. 12-1 at 17, and to the ALJ's factual mistake in finding, "[h]e did not have . . . aquatic therapy," Tr. 28, a proposition plainly contradicted by the treating record, Tr. 933, 1002-1011. Plaintiff contends this taints the exertional portion of the decision; yet, as the Commissioner notes, the ALJ accurately acknowledged Plaintiff's repeated treatment with physical therapy, Tr. 25-26, 28, of which aquatic therapy was a part.

---

[15] Plaintiff also makes a puzzling argument about his claimed use of an unprescribed cane. He contends that the ALJ made an improper lay medical judgment in concluding that the cane was not medically necessary. However, the finding that the cane was not medically necessary was made by the state-agency physician in connection with an earlier application. Tr. 119. In connection with the current application, the ALJ accurately noted Plaintiff's claim that he uses a cane and made no finding whether it was medically necessary, one way or the other. Tr. 25. This argument will not be discussed further.

Far more troubling, which Plaintiff also mentions, is the ALJ's rejection of Plaintiff's claim that a back disorder significantly affected his ability to work in the latter portion of the period in issue.[16]  This determination is not based on the state-agency physician opinion (because evidence of the exacerbation of the back impairment post-dates Dr. Quinn's file review), but rather on the ALJ's cryptic conclusion that, "[i]n the evidence of record, there are no MRIs, or other objective clinical findings to that show that the claimant is disabled"[17] as well as on the ALJ's inaccurate assertion that "[T]he claimant has had minimal treatment of his back."  Tr. 28. These errors suggest that the ALJ chose to ignore the abnormal findings in the February 2018 MRI: "Moderate . . . disc extrusion with moderate severe left neuroforaminal narrowing. Clinical correlation with L4 radiculopathy is recommended."  Tr. 1047.  They also suggest that the ALJ disregarded Dr. El-Khatib's post-MRI treatment, involving the immediate initiation of a course of injections, with the likelihood of more.[18]  Tr. 1045-46; see Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954, at *2-3 (D.R.I. Sept. 30, 2018) (where medical expert did not see records reflecting post-file-review hip injections, RFC lacked support of substantial evidence; matter remanded).  Importantly, the ALJ did not find that these post-review developments did "not constitute a significant worsening of the claimant's condition."  Id. at *3.

The Court's challenge, as the Commissioner emphasizes, is that Plaintiff has not marshalled this post-file-review evidence of worsening symptoms not seen by the state-agency

[16] The post-file-review developments regarding Plaintiff's back pain appear to fall out of the DIB period and to relate only to the SSI claim.  This issue should be developed further on remand.

[17] The ALJ was aware of the MRI; he mentioned it and summarized its findings in his exposition of the facts.  Tr. 26-27.  Thus, the sentence quoted in the text must be based on the ALJ's improper lay analysis of the MRI's findings, resulting in his unqualified conclusion that they are not consequential to the disability determination.

[18] While the Commissioner is right that Dr. El-Khatib's injections are considered "conservative treatment," spinal injections are not "minimal treatment," which is how the ALJ characterized them.  See Anderson v. Berryhill, 368 F. Supp. 3d 128, 135 (D. Mass. 2019) (epidural injection, pain medication and physical therapy considered "conservative treatment").

physician experts to level a frontal attack on the viability of their opinions. Nevertheless, I find that the Court cannot ignore[19] that the ALJ's exertional RFC is built on the foundation of Dr. Quinn's state-agency opinion, with the unexplained (added in "an abundance of caution") additional limit on lifting (twenty-five/ten pounds instead of fifty/twenty-five pounds). Tr. 30. This crucial Quinn opinion specifically relies on the absence of medical attention in response to Plaintiff's complaints of back pain – "seen at PCH w knee and back pain. Back not examined." Tr. 171. It is impossible to tell what additional limitations (for example, postural limits in the ability to climb ladders, ropes, stairs and scaffolds or in the ability to stoop, kneel or crouch) Dr. Quinn might have included if he had seen either the spinal MRI or Dr. El-Khatib's records reflecting the more aggressive spine treatment that followed the MRI.

These circumstances mean that this is a classic case where "the state-agency physicians were not privy to parts of [plaintiff's] medical record [which] detracts from the weight that can be afforded their opinions." Virgen C., 2018 WL 4693954, at *2-3. As Virgen C. makes clear, an ALJ cannot rely on a file-review opinion if post-review developments reflect a significant worsening of the claimant's condition because such an opinion does not amount to substantial evidence. Id. at *3 ("[I]f a state-agency physician reviews only a partial record, her 'opinion cannot provide substantial evidence to support [an] ALJ's residual functional capacity assessment if later evidence supports the claimant's limitations.'") (citing Ledoux v. Acting Comm'r, Soc. Sec. Admin., Civil No. 17-cv-707-JD, 2018 WL 2932732, at *4 (D.N.H. June 12, 2018)) (second alteration in original). And when the Court finds that a pivotal component of an ALJ's decision is not supported by substantial evidence, remand is required. Allen, 2015 WL 906000, at *8 (citing Jackson, 99 F.3d at 1097-98).

---

[19] See n.13 supra.

Apart from the Commissioner's argument that Plaintiff has waived his right to tackle Dr. Quinn's opinion (which I reject in the interest of a just outcome), the Commissioner's rebuttal to this concern is succinct: at Step Three/Four, the burden rests on the claimant and Plaintiff failed to provide "any precise functional assessment, completed by a physician to support the claimant's subjective physical complaints." Tr. 29. That is, there is no medical opinion supporting an RFC more limited than that set by the ALJ. In reliance on cases such as Jones v. Astrue, C.A. No. 09-206S, 2010 WL 2326261 (D.R.I. Feb. 19, 2010), adopted, 2010 WL 2326263 (D.R.I. June 2, 2010), the Commissioner contends that this renders any potential error in the ALJ's exertional RFC harmless. Id. at *4 n.1 ("Plaintiff fails to point out any specific, objective evidence that contradicts the ALJ's ultimate finding that he could perform a limited range of light work. In the absence of such a showing, any error by the ALJ in the degree of reliance on [the state-agency] opinion would be harmless.").

The flaw in the Commissioner's argument is that, without the Quinn opinion, which cannot support the ALJ's exertional RFC, what remains is woven "out of thin air." Virgen C., 2018 WL 4693954, at *2. That is, "[a]bsent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion." Alcantara v. Astrue, 257 F. App'x 333, at * 1 (1st Cir. 2007) (per curiam). Jones does not help; in Jones, the Court declined to remand not just because the claimant had failed to submit a medical opinion supporting a more limited RFC, but also because the ALJ had properly relied on a state-agency opinion found to be consistent with "the record as a whole including the subsequent treatment records." Jones, 2010 WL 2326261, at *11 (emphasis supplied). Here, the ALJ's reliance on the state-agency physician opinion is error because of the post-file-review

treating records (the MRI findings and MRI-based injections) evidencing a worsening of Plaintiff's spinal impairment that the state-agency physician did not consider.

Despite Plaintiff's failure to develop this argument, I find that the ALJ's reliance on Dr. Quinn's file-review-based opinion was erroneous in light of the post-file-review evidence of material worsening of the spine. The error is exacerbated by the ALJ's failure to grapple with these medical developments, batting them away with the statements that, "[i]n the evidence of record, there are no MRIs, or other objective clinical findings to that show that the claimant is disabled" and that "[t]he claimant has had minimal treatment of the back." Tr. 28. I therefore recommend that the Court also remand the matter for further consideration of Plaintiff's exertional RFC.

## V.      Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be DENIED. Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 3, 2020